# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **PRIME EAGLE GROUP LIMITED,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:08 CV 35** |
| | ) | |
| **STEEL DYNAMICS, INC.,** | ) | |
| **Defendant.** | ) | |

## OPINION and ORDER

The plaintiff in this case, Prime Eagle Group Limited ("PEGL"), alleges that it is

the assignee of the claims of Nakornthai Strip Mill Public Company Limited ("NSM"),[1]

against defendant Steel Dynamics, Inc. ("SDI"). NSM is a Thailand public limited

liability company which owns and operates a steel mini-mill located in Thailand.

Complaint filed January 28, 2008, DE # 1 (hereinafter, "Complaint"), ¶ 1. SDI is the

owner and operator of a steel mini-mill in Butler, Indiana. Id. The case is before the

court on SDI's motion to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(6) for

failure to state a claim.[2]

---

[1] Throughout this opinion and order the court has tried to correctly refer to either PEGL or NSM. However, because PEGL is bringing suit as NSM's assignee, any mistaken references to PEGL should be understood to mean NSM, and vice-versa.

[2] PEGL has moved for oral argument. (DE # 38). LOCAL RULE 7.5(a) requires the motion to "set forth specifically the purpose" for such a hearing. PEGL's motion states that the purpose is to "assist the court in determining the motion" to dismiss. The court is not convinced that this general justification satisfies RULE 7.5(a). Whether or not that is the case, the court does not believe that oral argument would assist in determining the issues raised by the motion, which will be denied.

A judge reviewing a complaint attacked by a Rule 12(b)(6) motion must accept all of the factual allegations therein as true. *Erickson v. Pardus*, 551 U.S. 89, –, 127 S. Ct. 2197, 2200 (2007). Under the liberal notice-pleading requirements of the FEDERAL RULES OF CIVIL PROCEDURE, the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The complaint need not contain detailed facts, but in order to show an entitlement to relief it must contain facts that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, –, 127 S. Ct. 1955, 1965 (2007). Even if the truth of the facts alleged appears doubtful, and recovery remote or unlikely, *Id.*, the court cannot dismiss a complaint for failure to state a claim if, when the facts pleaded are taken as true, plaintiffs have "nudged their claims across the line from conceivable to plausible." *Id.*, 550 U.S. at –, 127 S. Ct. at 1974.

Another aspect of the standard applicable to RULE 12(b)(6) motions also must be mentioned. Although a motion to dismiss for failure to state a claim most often, as in *Twombly*, raises the issue of whether the plaintiff has pleaded sufficient facts, it is also true that a plaintiff can put too many facts in the complaint, thereby "plead[ing] itself out of court by pleading facts that establish an impenetrable defense." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008). In the present case SDI's motion proceeds using both avenues, attacking the complaint for being devoid of some essential facts, and also for containing facts by which PEGL has pleaded itself out of court. Primarily, however, SDI makes the latter argument, contending that the facts in the complaint

show that the present case is barred by the applicable statute of limitations. (No matter which statute of limitations the court chooses: the identity of the correct statute being another issue raised by SDI.)

## I. Background

The complaint in this action is complex: it is 48 pages long, contains 187 paragraphs, many of which are lengthy, and seeks over one billion dollars in damages for alleged fraud and constructive fraud. In its response to SDI's motion to dismiss, PEGL manages to summarize the complaint in a few paragraphs. Quoting them here is perhaps the best way to adequately summarize the complaint, as PEGL understands it:

> [F]rom March 1998 through mid-1999, SDI exercised management control over NSM, a start-up enterprise struggling to survive the financial crisis sweeping through Southeast Asia. In March 1998, SDI, one of the world's leading experts on the operation and design of steel mini-mills, became NSM's strategic partner in connection with a $500,000,000 securities offering. Soon thereafter, SDI came to believe that NSM would suffer enormous financial losses and feared that, unless it terminated its relationship with NSM, it would be required to consolidate the financial results of NSM, which would have had a devastation impact on SDI's financial results and its publicly-traded stock. SDI devised an exit strategy to create a pretext to terminate its relationship with NSM and avoid financial consolidation. Central to its strategy was SDI's fraudulent declarations that NSM's mill was riddled with serious design flaws, and thus could not achieve capacity level production — defects that would have cost approximately $100,000,000.00 to remedy. SDI used its managerial power and control to assemble a management team at NSM that would, and did, rely on these false assertions, charting a destructive course for NSM, culminating in the suspension of NSM's operations in February 1999. SDI did not drop the reins of managerial power until mid-1999, when the holders of hundreds of millions of dollars of debt instruments declared a default against NSM and seized NSM's cash accounts. NSM was thereafter forced to endure a costly and protracted rehabilitation process under Thai law. Finally, in late 2003, upon the

approval of its business reorganization plan in December 2002 and a
successful raise of funds through a Thai public offering in October 2003,
NSM was able to restart the plant. By December 2004, NSM achieved near
capacity level production without experiencing or correcting any of the
major design flaws asserted by SDI.  .  .  .

        NSM sues for over a billion dollars in damages, reflecting the loss
of net profits as a result of its inability to operate over an approximate five
year period and the approximate $50,000,000 expended during the
restructuring process.

Plaintiff Prime Eagle Group Limited's Brief in Opposition to Defendant's Motion to

Dismiss (DE # 37) (hereinafter "Opp.") p. 2.

        SDI argues that the complaint fails to state a claim for five reasons. Stated as

simply as possible, those reasons are: 1) the six-year statute of limitations for fraud and

constructive fraud had already expired when the complaint was filed; 2) the true theory

of the case is tortious interference with contract, governed by a two-year statute of

limitations, which had already expired when the complaint was filed; 3) SDI's

statements were of its opinion, not statements of fact, and so are not actionable; 4) the

complaint fails to plead that NSM was damaged by its reliance on SDI's statements,

instead pleading damages resulting to NSM because of actions taken by its bondholders

in reliance on SDI's statements; and 5) the constructive fraud claim fails because the

complaint alleges neither a confidential relationship between the parties, nor an

unconscionable advantage gained by SDI. The first two arguments fall in the category of

a party pleading itself out of court by alleging too many facts, the latter three in the

category of the complaint not alleging enough facts to show a plausible claim. The court

will address the second category first.

4

**II. Whether Claim for Relief is Plausible?**

*A. Statements of Opinion or of Fact?*

The elements of actual fraud under Indiana law[3] are: 1) a material

misrepresentation of a past or existing fact by the defendant; 2) which was false;

3) which was made with knowledge or reckless ignorance of the falseness; 4) which was

relied on by the plaintiff; 5) proximately causing the plaintiff injury. *In re M.B.*, 896

N.E.2d 1, 14 (Ind. Ct. App. 2008). Because the first element requires misrepresentation of

a fact, statements which are merely expressions of opinion are not actionable. *Vaughan*

*v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir. 1986). The purpose lying behind the

distinction between statements of fact and opinion is to prevent suits based on sales

"puffery," *e.g.*, "this product is of the finest quality." *See Whiteco Properties, Inc. v.*

*Thielbar*, 467 N.E.2d 433, 437 (Ind. Ct. App. 1984).

---

[3] The parties have not raised a choice of law issue and have argued the motion assuming that all claims raised in the complaint are governed by Indiana law. For that reason the court applies Indiana substantive law. *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009) (*citing Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits")). The court notes, however, that application of all of Indiana's substantive law, including its choice-of-law rules, might indicate that the law of Thailand apply if SDI's allegedly fraudulent statements, and harm caused by them, occurred in Thailand. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 705 (2004) (citing cases applying *lex loci delicti* rule in tort cases where harm occurred in foreign jurisdiction); *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 286-87 (7th Cir. 1990) (applying Indiana's modified *lex loci delicti* approach).

The complaint lists the statements that PEGL alleges SDI fraudulently made[4] at ¶ 71, all concerning supposed design flaws in NSM's mill. Paraphrasing them briefly, SDI stated that a single electric-arc furnace was inadequate and that a second furnace should be added; that the cranes in the scrap bay were inadequate to handle the necessary volume of raw materials; that ladle-refining stations were so "over-designed and over-automated" that they were not functional; the crop pit was poorly designed placing a "serious constraint" on high-volume production; and that incomplete and incorrect software was causing substantial automation problems. SDI argues that all of these statements are merely of its opinion–which it notes it was hired as a technical advisor to provide—and are similar to those found non-actionable in *Royal Business Machines v. Lorraine Corp.*, 633 F.2d 34 (7th Cir. 1980) (remarks by seller to buyer such as that machines were of "high quality" were sales puffing and so non-actionable opinion).

SDI ignores the fact that other statements made by the seller in *Royal Business Machines*, such as that "the machines were safe" were found to be actionable as statements of fact. *Id*. at 45. While that statement was obviously the salesperson's (or his company's) opinion, the general rule in Indiana is that if a statement is "susceptible of exact knowledge" when made, it is a statement of fact rather than opinion. *Smart & Perry Ford Sales, Inc. v. Weaver*, 143 Ind. App. 693, 697, 274 N.E.2d 718, 721 (1971). Some

---

[4] It should be noted that all references in this opinion to SDI's "false statements," "misrepresentations," "fraudulent scheme," etc., are simply a description of the allegations in the complaint and the events as PEGL sees them, and are not intended to state or imply any opinion as to the truth of those allegations.

of SDI's alleged statements—such as that a single electric-arc furnace, and the scrap-bay cranes, were inadequate to produce the necessary volume of steel—fall in that category.

In addition, while SDI characterizes the fraud claim against it as "ironic given that SDI was hired as a technical advisor to provide precisely this type of criticism," Defendant Steel Dynamics, Inc.'s Brief in Support of Motion to Dismiss (DE # 32) (hereinafter, "Motion") p. 18, this observation points to an important difference between the present case and *Royal Business Machines*. While, as in that case, statements of opinion made by a seller to a buyer are non-actionable puffing, when the party stating the opinion claims or expresses special knowledge, and the opinion is justifiably relied upon as being true, suit can be brought for harm that results. *Reeve v. Georgia-Pacific Corp.*, 510 N.E.2d 1378, 1383 (Ind. Ct. App. 1987). As SDI itself notes, NSM contracted with it precisely because of its expertise.[5] Although such a claim is normally viewed as one based on a theory of constructive, not actual, fraud, *Smart & Perry Ford Sales, Inc. v. Weaver*, 143 Ind. App. 693, 697, 274 N.E.2d 718, 721 (1971), PEGL's complaint also includes allegations of constructive fraud.[6]

For these reasons, the court does not believe that the complaint fails to state a claim because it alleges only non-actionable statements of opinion.

---

[5] To be accurate, the contract was between SDI and NSM Management Co., LLC an entity created to provide management services to NSM under a separate contract. The allegations of the complaint described herein are sufficient to raise a factual issue as to whether this arrangement created a confidential relationship between NSM and SDI.

[6] SDI argues that the complaint's constructive fraud allegations are also insufficient, which will be discussed *infra* in subsection (C).

*B.  Does Complaint Plead NSM's Reliance?*

As noted above, the fourth element of actual fraud under Indiana law (and also an element of constructive fraud) is that the plaintiff relied on the defendant's false material misrepresentation(s). *In re M.B.*, 896 N.E.2d at 14. SDI points out that PEGL's allegation is that NSM's bondholders relied on SDI's representations, and based on that reliance, "restricted NSM's use of cash, hampering and frustrating its ability to operate, and seized the funds in the off-shore accounts, leading to NSM['s] long and expensive restructuring process." Complaint ¶ 176. Thus, SDI argues that the complaint fails to state a claim because it alleges that NSM was harmed not by its own reliance on SDI's statements, but by its bondholders' reliance on those statements, and concomitant restrictions on NSM's access to funds.

However, as SDI acknowledges, PEGL also alleges that NSM's managerial team and Board of Directors relied on SDI's "false representations in putting NSM on a destructive course[.]" Complaint, ¶ 175. SDI argues that PEGL also admits, at ¶ 73 of the Complaint, that NSM's CEO, John Schultes, disagreed with SDI's representations, which is "fatal" to any claim of reliance, and that the "destructive course" allegation is "conclusory" and "does not come close" to pleading the circumstances of fraud with particularity as required by FED. R. CIV. P. 9(b). Motion pp. 20-21.  Although the complaint, despite its length, could have pleaded NSM's reliance better, perfection isn't the standard. and the court disagrees with both aspects of SDI's argument.

First, the fact that NSM's CEO Schultes disagreed with SDI's criticisms is not "fatal" to an argument that NSM relied on SDI's statements. Although Schultes' disagreement is an important fact bearing on the issue of when NSM's Board of Directors should have begun investigating SDI's statements, as will be discussed *infra*, that does not change the fact that the complaint alleges that a part of NSM's "destructive course" taken in reliance on SDI's statements was the discharge of Schultes as the result of his disagreement with SDI. In paragraphs 73-87 of the complaint PEGL explains that SDI engineered Schultes' ouster from the company, convincing NSM's Board to force him to resign, allowing SDI to install a management team which would help carry out its scheme to halt NSM's operations.

As to the argument that PEGL's allegation that NSM's Board put it on a "destructive course" is too conclusory, SDI itself acknowledges, Motion pp. 20-21 n. 11, that PEGL specifies that the destructive course included the Board and management team causing NSM to abandon its original business plan; abort completion of the mill; frustrate assistance from other technical experts in the field; dismiss knowledgeable expatriate experts and managers; delay payment of purchase orders causing material shortages and production delays; obstruct exports; block the filing of a registration statement with the United States SEC; and fail to resume production after a lightning strike in December 1998. Yet, without any explanation why these allegations are not sufficient, SDI itself makes a conclusory statement: 'Simply alleging NSM was put on a

'destructive course' does not come close to meeting this [pleading specificity] standard." Motion p. 21.

As already said, the court disagrees. There is no doubt that the complaint alleges that NSM's bondholders also relied on SDI's misrepresentations, causing funding problems that led to NSM's collapse and rehabilitation. Thus, although the complaint poses a "chicken or egg" question—which came first, the destructive course, contributing to NSM's bondholders' decision to restrict access to funds, or the bondholders' decision to restrict funds, which caused the "destructive course" events—the complaint as a whole makes the former plausible. For that reason, SDI has not persuaded the court that the complaint should be dismissed because its allegations concerning NSM's reliance on SDI's misrepresentations are not sufficient.

*C. Does Complaint Allege Confidential Relationship/Unconscionable Advantage?*

The elements of constructive fraud are: 1) a duty owed to plaintiff by defendant arising from their relationship; 2) a violation of that duty by misrepresentation or by silence when a duty to speak exists; 3) reliance by the plaintiff; 4) injury proximately caused by that reliance; and 5) the defendant's gaining of an advantage at the plaintiff's expense. *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996). The duty arising from the parties' relationship occurs in two ways: some type of confidential/fiduciary relationship, or a buyer-seller relationship where one party misuses superior

knowledge. *Morfin v. Martinez*, 831 N.E.2d 791, 802 (Ind. Ct. App. 2005). Whether a confidential/fiduciary relationship exists is ordinarily a question for the trier of fact. *Id.*

A fiduciary relationship does not arise from an ordinary, arms-length business contract. *Wilson v. Lincoln Federal Sav. Bank*, 790 N.E.2d 1042, 1046-47 (Ind. Ct. App. 2003). SDI argues that the allegations of the complaint show that nothing more existed between the parties here:

> In connection with NSM's 1998 public offering, SDI was retained as a consultant to provide NSM with (i) advice regarding management techniques, business culture, and operations applicable to mini-mills [citation omitted], and (ii) personnel on a short-term basis to train NSM's operating personnel. [Citation omitted] Sdi and Nsm also entered into a reciprocal license agreement that allowed each party to share operational and technical know-how. [Citation omitted.]These contracts establish a business relationship that is not fiduciary in nature as a matter of law.

Memorandum p. 22. SDI then immediately admits,[7] Motion p. 22, n. 12, that SDI was also one member of a three-member limited liability company created to supervise NSM's management, NSM Management Co., LLC, Complaint ¶¶ 33-34, but asserts that this did not create a fiduciary relationship because it did not have the power to make management decisions by itself.

The court disagrees. SDI's role as one member of NSM Management Co. is one fact suggestive of a fiduciary relationship. In addition, NSM pleads other facts in the complaint that are indicative of a fiduciary relationship. For example, the relationship between the parties was not, as SDI contends, a simple arms-length business

_____

[7] SDI's candor is appreciated, and is unlike many cases in which parties simply ignore facts which do not help their arguments.

transaction. The complaint pleads that SDI had a significant ownership stake in NSM, holding 10% of its outstanding stock with anti-dilution provisions. Complaint ¶¶ 2, 44. In addition, it pleads that under the shareholders' agreement, SDI had a right to representation on NSM's Board of Directors, pursuant to which it appointed its President and CEO to serve on the Board. Complaint ¶¶ 2, 45. Unquestionably, directors owe a fiduciary duty to their corporation.[8] *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227 (Ind. 2001). Simply put, there are enough facts in the complaint suggestive of a fiduciary relationship to avoid dismissal.

SDI's argument that the complaint is inadequate because it fails to allege that SDI abused that relationship to secure an advantage at NSM's expense also fails to gain traction. As SDI admits, the complaint outlines, in detail, that SDI's scheme was to disparage NSM's mill, forcing it out of business—the harm—so that SDI could sever its relationship with NSM, thereby gaining the advantage of not having to consolidate NSM's losses into its financial results, which could have had a devastating impact on SDI's own stock price.[9] SDI argues that this theory is not plausible because it simply could have withdrawn from its management relationship with NSM, avoiding the

---

[8] NSM is a Thai public limited liability corporation. SDI does not argue that its directors have no such duty under Thai law.

[9] The complaint also alleges other advantages gained by SDI at NSM's expense, which SDI's argument does not address. For example, that SDI induced NSM computer programmers to reveal valuable and confidential source code to SDI. Complaint ¶ 6.

consolidation issue while at the same time not making statements harmful to its own financial interest in NSM. Motion p. 23.

The complaint alleges, however, that SDI needed "to create a pretext to terminate its contractual obligations" with NSM. Complaint ¶ 67. In its memorandum opposing SDI's motion, PEGL argues that this was for two reasons: to mitigate SDI's exposure to bondholders in "looming" securities fraud actions, and to provide a reason to terminate its relationship with NSM for cause. Opp. p. 24. The first of these two reasons is suggested by the allegations of the complaint. Complaint ¶¶ 88-91 (SDI informed note holders of design flaws in October 1998, then asked them to indemnify it from any legal claims). The second reason, that SDI needed a reason why its relationship could be terminated for cause, is not alleged in the complaint. However, it is common for contracts to contain provisions requiring cause for termination (or making termination for that reason advantageous), and in its Reply Memorandum (DE # 43) SDI has not asserted that PEGL's argument concerning a for-cause termination is groundless. PEGL's explanation that SDI was trying to create a reason to terminate the relationship for cause is consistent with the allegations of the complaint, and even after *Twombly*, the need for a complaint to allege a "plausible" theory still does not require a complaint to plead every factual detail, just enough facts to raise the right to relief above a speculative level. *Twombly*, 127 S. Ct. at 1965. PEGL's allegations of unfair advantage, based on a theory of pretext and for-cause termination, meet this standard, although it is a close question. *See Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 574 (7th Cir. 2009)

13

("the complaint in a complex case must, to avert dismissal for failure to state a claim, include sufficient allegations to enable a judgment that the claim has enough possible merit to warrant the protracted litigation likely to ensue from denying a motion to dismiss.")

For these reasons, the court does not believe that PEGL has failed to adequately plead the existence of a confidential relationship or SDI's having gained an advantage at NSM's expense.

## III. Whether the Complaint is Barred by the Applicable Statute of Limitations?

### A. Two-year limitations period for tortious interference with contract

SDI argues that the true theory of PEGL's case is tortious interference with contract—that is, that SDI made misrepresentations to NSM's bondholders, which caused them to restrict NSM's access to funds—and that the two-year statute of limitations applicable to that tort, Ind. Code § 34-11-2-4(2), has long expired. SDI's argument is premised on its argument, discussed above in section II(B), that PEGL has pleaded only that NSM was harmed by its bondholders' reliance on SDI's misrepresentations, not by its own reliance. For the reasons given above, the court disagrees with this reading of the complaint, and therefore also with SDI's characterization of the complaint as pleading only a claim for tortious interference with contract. For this reason, there is no need to consider the two-year statute of limitations applicable to that claim any further.

*B. Six-year limitations period for fraud/constructive fraud*

The statute of limitations for fraud and constructive fraud is six years. Ind. Code § 34-11-2-7(4). Under Indiana law, the limitations period begins to run when the claim "accrues," that is, "when a claimant knows or in the exercise of ordinary diligence should have known of the injury," *Cooper Indust., LLC v. City of South Bend*, – N.E.2d –, –, 2009 WL 146537 *3 (Ind. 2009), and that the injury was caused by the tortious act of another. *Horn v. A.O. Smith Corp.*, 50 F.3d 1365, 1369 (7th Cir. 1995).

The "exercise of ordinary diligence" requires a party suffering an injury to investigate its potential sources. *Horn*, 50 F.3d at 1371-72; *Miller v. A.H. Robins Co., Inc.*, 766 F.2d 1102, 1105-06 (7th Cir. 1985); *State v. Puckett*, 531 N.E.2d 518, 524 (Ind. Ct. App. 1988). The determination of the point of accrual is generally a question of law for the court to decide. *Cooper Indust., LLC,* 2009 WL 146537 at *3; *Horn*, 50 F.3d at 1370 ("Despite the fact-specific nature of this inquiry, the point at which a cause of action accrues may be determined as a matter of law if the relevant facts are undisputed and they lead to but one conclusion.")

SDI argues that, at the very latest, the claim accrued when NSM knew that it had been harmed by SDI's conduct, which was in July, 1999, when the bondholders began restricting NSM's access to funds. This would mean that the statute of limitations

expired in July, 2005, two and a half years before PEGL filed its complaint in January, 2008.[10] PEGL contends that the claim did not accrue until much later:

> [A] reasonable person in the position of NSM could not have discovered the falsity of SDI's design flaw claims until it restarted the mill and successfully reached near capacity level production, which did not occur until December, 2004 [citation omitted], or, at the earliest, when it obtained the Corus report[11 ] in August 2002.

Opp. pp. 12-13. Alternatively, PEGL argues that SDI is estopped from asserting the statute of limitations because of fraudulent concealment.

   *1. Point of accrual*

There are two problems with PEGL's argument concerning the point of accrual. PEGL's argument is that the question of when a person exercising ordinary diligence would have discovered that SDI's criticisms were false is, under Indiana law, to be determined using a partially-subjective standard:

> In determining accrual, the Indiana courts use a reasonable person standard, but not a detached outside observer. "Rather, it is a reasonable person who has been subjected to the conduct which forms the basis for the plaintiff's complaint . . . we look at 'a reasonable person *in the position of the plaintiff.'" Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996), *quoting*, *Riley v. Presnell*, 409 Mass. 239, 565 N.E. 2d 780 (1991).

---

[10] It bears remembering that PEGL's theory of the case is NSM suffered harm much earlier, when it was put on a "destructive course" by SDI's misrepresentations.

[11] The Corus report was a technical consultant's report, obtained during NSM's rehabilitation, indicating that there were no major problems with the mill's design. Complaint ¶¶ 150-153.

Opp. pp. 11-12. Thus, PEGL argues that the court must consider whether a person in NSM's shoes, that is, under the control of a management team put in place by SDI, would have discovered the falsity of NSM's statements any sooner than NSM did.

The first problem with this argument is that it is based on an incorrect statement of Indiana law. The entire quotation from *Doe*, not just the part within the single quotation marks, is a quotation from the *Riley* case, used by the *Doe* court explaining the authority for Doe's position. As to that position, the *Doe* court stated: "Our research has led us to the conclusion that the authority cited by Doe for the objective 'reasonable person in the position of plaintiff' standard for the discovery of a cause of action belongs to a very slim minority." 673 N.E.2d at 842. The *Doe* court then concluded that "[u]nder Indiana's objective standard" the plaintiff should have discovered the cause of her injury sooner, and so her action was barred by the statute of limitations. *Id*. at 844.

The second problem with PEGL's argument is that, even if the court were to apply a "reasonable person in the position of plaintiff standard," PEGL's focus solely on NSM's management team is too limited. It is PEGL that pleads and argues that NSM's *Board of Directors* relied on SDI's misrepresentations, which resulted in an SDI-controlled management team being put in place as part of the "destructive course" that SDI's misrepresentations placed NSM on: "The managerial decision-makers of NSM, put in place by SDI, *and the NSM Board of Directors*, relied on said false representations in putting NSM on a destructive course[.]" Complaint ¶ 175 (emphasis added).

> The Complaint details SDI's scheme to usurp the management of NSM, through, *inter alia*, forcing Schultes [NSM's CEO at the time] to resign to ensure management that would rely on SDI's claims of purported design flaws, putting NSM on a destructive course.

Opp. p. 22 (citations to complaint omitted). In fact, the complaint does detail how SDI "pushed the NSM Board to terminate Schultes," Complaint ¶ 79, culminating in his resignation on September 28, 1998, to avoid termination for cause. Complaint ¶¶ 77-81. Thus, the question as to when PEGL/NSM's fraud claim accrued must be answered by determining when NSM's Board of Directors was in possession of information that would have caused a reasonable board to investigate further, rather than acceding to, and hastening, NSM's "destructive course."[12]

The complaint contains a number of allegations which shed light on this question. NSM was formed in 1994, and in October 1995 John Schultes, an engineer formerly with US Steel, became NSM's President and Chief Executive Officer. Complaint ¶¶ 16, 21. In the fall of 1997, because of a severe recession that had been impacting Thailand and all of Southeast Asia for over a year, NSM turned to United States debt and equity markets to obtain capital needed to complete construction of, and operate, its mini-mill, engaging the services of an investment banker, McDonald & Co.

---

[12] NSM's Board of Directors had 14 members, only one of whom was controlled by SDI. Complaint ¶ 45. PEGL has not argued that under Thailand's corporate law, the Board had neither the power, nor the responsibility, to oversee NSM and its management. Notably, the Chairman of NSM's Board was Sawasdi Horrungruang, who is a member of a group of individuals referred to as the "Horrungruang Group," Complaint ¶¶ 10, 16, which held a controlling interest in NSM, and formed PEGL, the alleged assignee of NSM's claims and plaintiff in the present litigation. Complaint ¶¶ 10, 12, 14, 16.

Securities, Inc. ("McDonald"). Complaint ¶¶ 24, 26, 31. McDonald, in order to induce investors to participate in the planned securities offering, convinced NSM to give management control to SDI, considered to be a world leader in steel mini-mill operations. Complaint ¶ 31.

Oversimplifying, this was accomplished by forming NSM Management Co., LLC, to manage NSM's business affairs. Complaint ¶ 33. NSM Management Co. had only three members: SDI, McDonald and the now-infamous Enron Corporation. Complaint ¶ 33. NSM assigned and delegated to NSM Management Co. the right and obligation to manage its business affairs, *with limited reserved rights in NSM's Board of Directors*. Complaint ¶ 34. SDI, the only member of NSM Management Co. with the necessary technical expertise, Complaint ¶ 35, entered into an advisory agreement with NSM Management Co., in exchange for financial consideration including significant equity in NSM and a licensing agreement allowing it to use technology created by NSM. Complaint ¶ 46. The advisory agreement, among other provisions, provided that SDI was not undertaking an obligation, directly or indirectly, to control NSM's management, and that at all times NSM Management Co. was to take all of its directives from, and be solely answerable to, NSM. Complaint ¶ 39. The court cannot help but observe that this arrangement is somewhat circular: NSM Management Co. was to take all of its directives from NSM, which it was responsible for managing. This leaves NSM's Board of Directors, using whatever limited rights it reserved, as—so to speak—the only non-fox guarding the henhouse.

SDI's role pursuant to the advisory agreement with NSM Management Co. was highly touted in the securities offering materials to induce investors to participate, Complaint ¶¶ 35, 47, 48. In 1998, "road shows" were conducted at various locations in the United States as part of the marketing of the securities offering. Complaint ¶ 50. Keith Busse, SDI's President and CEO, actively participated in these presentations and lavished praise on the design of NSM's mini-mill. Id.

Following the offering, which occurred in March, 1998, NSM Management Co. took managerial control of NSM. Complaint ¶ 59. Schultes was left in place as President and CEO, while a former employee of McDonald, Gary Heasley, became Vice President and CFO, and an employee of SDI, Tony Faulds, became manager of operations. Id. At the time of the March, 1998, offering, the Asian economy was still deteriorating, and in the following months steel prices plummeted. Complaint ¶ 60. Busse wrote a letter to Schultes dated June 4, 1998, expressing concern that with its then-current costs of production, NSM stood to lose $200-300 million dollars per year and would "surely perish" without "enormous changes." Complaint ¶¶ 62, 63. Busse also raised concerns about the quality of NSM's management team and employees, and worry that SDI had associated its "good name" with NSM. Complaint ¶¶ 63-64. Busse did not mention any belief that the mini-mill itself suffered from serious design flaws, instead stating in the letter that the "quality of the core equipment is excellent . . . ." Complaint ¶ 65.

According to the theory of PEGL's complaint, SDI then began to implement its "exit strategy." Complaint ¶ 67. On August 24, 1998, SDI's attorney, Robert Walters,

wrote a letter to NSM's attorney, which was also delivered to NSM's Board of Directors. Complaint ¶¶ 67, 68. In addition to reiterating Busse's earlier concerns, Walters listed what SDI viewed as serious design flaws in NSM's plant, the allegedly fraudulent statements at the heart of this suit: that a single electric-arc furnace was inadequate and that a second furnace should be added; that the cranes in the scrap bay were inadequate to handle the necessary volume of raw materials; that ladle-refining stations were so "over-designed and over-automated" that they were not functional; that the crop pit was poorly designed placing a "serious constraint" on high-volume production; and that incomplete and incorrect software was causing substantial automation problems. Complaint ¶ 71. These problems would have cost approximately $100 million to correct. Complaint ¶ 72.

NSM's President and CEO, Schultes, strenuously disagreed. He wrote a letter to NSM's Board of Directors dated September 7, 1998, refuting every one of SDI's criticisms of the mini-mill. Complaint ¶ 73. He stated his expectation that in early 1999, NSM would be the "best performing mill in the world[.]" Complaint ¶ 74. He stated that the mill had set new records for a start-up mill, well ahead of projections. Complaint ¶ 76. However, on September 25, 1998, NSM's Board of Directors met, and acceded to SDI's pressure to demand Schultes's resignation. Complaint ¶¶ 79, 80, 81. John Nolan, an SDI Vice President, then became the de facto CEO of NSM. Complaint ¶¶ 59, 81, 82.

In December, 1998, a lightning strike caused a temporary shut-down of NSM's plant. Complaint ¶ 95. SDI, acting through its employees, Nolan (NSM's *de facto* CEO) and Faulds (NSM's acting operations manager), frustrated attempts to re-start the plant: after foreign experts insisted on resuming production, Nolan and Faulds stated that the Thailand Energy Generating Authority had ordered that the plant be shut down. Id. It was later discovered that no such order had been issued. Id.

On December 30, 1998, with the plant still shut down, SDI delivered written notice to NSM and NSM Management Co. that it was terminating its advisory and licensing agreements because it had been induced to enter into them by misrepresentations concerning the design and capabilities of NSM's mill. Complaint ¶ 97. Despite that, Nolan and Faulds remained at NSM until June 1999, acting, according to SDI, to protect its interest as a shareholder, during which time they continued to frustrate NSM's efforts to re-start the plant. Complaint ¶¶ 120-123. By February, 1999, repairs had been made, even though NSM's non-SDI engineers believed those repairs unnecessary to restarting operations. Complaint ¶ 124. However, Nolan and Faulds (and McDonald's former employee, Heasley) still opposed restart, and—again despite SDI's termination of its agreements—"[b]ecause they were in managerial control, NSM was not able to resume operations." Id.

At a meeting in March or April 1999 at NSM's plant in Thailand, Nolan informed a representative of Bay Harbour, the largest single NSM bondholder, that the plant had serious design flaws, and shouldn't be restarted without millions of dollars in repairs

and corrections. Complaint ¶ 126. Bay Harbour and other bondholders then began to exercise rights (under the terms of the instruments involved in the securities offering) to restrict NSM's access to cash held in trust accounts. Complaint ¶ 127. In July, 1999, amounts due under the notes were accelerated, and in September, 1999, the trustee foreclosed on $85 million is cash. Complaint ¶¶ 129-130. In April, 2000, NSM entered into a business rehabilitation process administered by the Thailand Central Bankruptcy Court. Complaint ¶ 150.

The question, posed nearly four pages ago at the beginning of this outline of events, is whether—and if so, when—these circumstances show that NSM's Board of Directors was in possession of information that would have caused a reasonable board to investigate SDI's allegations that the NSM's mill had major design flaws. It is this court's determination that the facts allow only one conclusion: by July, 1999, at the latest, as SDI argues, a reasonable board would have started an investigation of SDI's allegations.

In fact, the Board should have heard a warning alarm when SDI first raised its design flaw charges in Walters' August, 1998, letter. At that point NSM's Board knew that Busse, SDI's CEO, had concerns about NSM's ability to operate profitably in the deteriorating Asian economy, but nevertheless had, only two months earlier, stated in writing that the quality of NSM's core equipment was excellent. This opinion would have been consistent with SDI's decision to become involved with NSM's project in the

first place. The August, 1998, assertion of design flaws was a 180-degree turn of events and should have caused the Board to wonder whether something was amiss.

Next, about a week later, NSM's Board had Schultes' refutation of SDI's charges to consider. Rather than seeking the opinion of an outsider at that point, the Board acceded to SDI's demands to force Schultes to resign.

The next warning signal was in December, 1998, when Nolan and Faulds resisted efforts to restart operations at the mill, despite the opinion of non-SDI engineers that the plant should be restarted. At that point, the Board could have determined whether it was true, as Nolan and Faulds had asserted, that the Thailand Energy Generating Authority had ordered the plant to remain shut down.

Last, Nolan and Faulds' continued presence at the plant in 1999, *after* SDI had terminated its advisory agreement with SDI Management Co., and continued efforts to stop NSM from resuming operations, including by communicating the alleged design flaws to NSM's bondholders, should have alerted the Board that SDI's allegations needed a hard look. Therefore, the court concludes that NSM's fraud claims accrued no later than July, 1999, making a complaint filed 8½ years later, in January, 2008, untimely. That is, unless PEGL is correct that SDI is estopped from asserting the statute of limitations by the doctrine of fraudulent concealment.

Although equitable in origin, the doctrine of fraudulent concealment has been made a part of Indiana statutory law: "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be

brought at any time within the period of limitation after the discovery of the cause of action." Ind. Code § 34-11-5-1. In addition to active acts, fraudulent concealment can also be passive. *Palmer v. Gorecki*, 844 N.E.2d 149, 155 (Ind. Ct. App. 2006). Passive fraudulent concealment occurs when a party in a confidential relationship who has a duty to disclose information, fails to do so. *Malachowski v. Bank One, Indianapolis*, 590 N.E. 2d 559, 563 (Ind. 1992).

PEGL argues that SDI is guilty of both active and passive fraudulent concealment in the circumstances here. SDI's acts of active concealment, PEGL alleges, were forcing the termination of Schultes in September, 1998, and acts that allegedly occurred in late 1998 to mid-1999, involving the shredding of documents and removal/destruction of computers and electronic information, described in paragraphs 132 and 134 of the complaint. The passive concealment, as the court understands it, is essentially the same as the fraud itself: that is, SDI's failure to disclose to NSM that its criticisms of the mill's design were false. There are a number of reasons why both of these fraudulent concealment arguments fail.

As to active fraudulent concealment, the doctrine estops a defendant from asserting the statute of limitations who has "concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action," *Southerland v. Hammond*, 693 N.E.2d 74, 78 (Ind. Ct. App. 1998), that is, engaged in acts which prevent a plaintiff using ordinary diligence from obtaining information. *Johnson v. Blackwell*, 885 N.E.2d 25, 32 (Ind. Ct. App. 2008); *Battema v. Booth*, 853 N.E.2d 1014,

1021 (Ind. Ct. App. 2006) (statute begins to run when plaintiff exercising ordinary diligence should have discovered injury). As explained above, there are sufficient facts which cause this court to conclude that NSM, if exercising reasonable diligence, would have discovered its injury no later than July, 1999. None of the acts of concealment alleged by NSM disguised these facts from NSM, or prevented it from investigating them further. In fact, what PEGL describes as one of the acts of concealment—SDI's efforts to force the Board of Directors to demand Schultes' resignation or fire him—is, as the court has already explained, one of the events that should have caused the Board to question SDI's conduct.

As to passive fraudulent concealment, the concealment terminates, and the limitations period runs, when the confidential relationship terminates. *Hughes v. Glaese*, 659 N.E.2d 516, 520 (Ind. 1995); *Battema*, 853 N.E.2d at 1021. Any confidential relationship that may have existed in the present case ended on December 30, 1998 when SDI gave formal written notice of termination of its agreements with NSM Management Co. and NSM, or at the latest in June, 1999, when Nolan and Faulds left.[13] Either way, the filing of the complaint on January 28, 2008, comes more than six years later.

Last, as to both active and passive fraudulent concealment, the estoppel does not create an entirely new limitations period, instead, the claim must be brought within a

_____

[13] PEGL admits that "SDI's control of NSM continued through mid-1999[.]" Opp. p. 13.

26

reasonable time after the statute of limitations begins to run. *Boggs v. Tri-State Radiology, Inc.*, 730 N.E.2d 692, 698 (Ind. 2000); *Hughes*, 695 N.E.2d at 519; *Battema*, 853 N.E.2d at 1021; *Southerland*, 693 N.E.2d at 78.

> The fraudulent concealment exception does not establish a new date for the commencement of the statute of limitations, but instead creates an equitable exception. Under this equitable exception, instead of a full statutory limitations period within which to act, a plaintiff must exercise due diligence in commencing his action after the equitable ground ceases to operate as a valid basis for causing delay. Therefore, a plaintiff must institute an action within a reasonable time after he discovers information which would lead to discovery of the cause of action.

*Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 690-91 (Ind. Ct. App. 2006) (citations omitted). In the present case, even were the court to accept PEGL's argument that a "reasonable person in the position of NSM could not have discovered the falsity of SDI's design flaw claims until it restarted the mill and successfully reached near capacity level production, which did not occur until December, 2004," Opp. pp. 12-13, PEGL does not explain why it then waited three years, until January 2008, to file its complaint. PEGL did not bring its claim within a reasonable time, and for this and the reasons above, its fraudulent concealment argument does not excuse its delay.

## IV. Whether PEGL Should Be Allowed to Amend Its Complaint?

As a final matter, PEGL argues that should the court find "any pleading deficiency," Opp. p. 25, the court, rather than dismissing, should allow it to file an amended complaint, citing the federal policy of deciding cases on their merits rather than technicalities, which requires giving a plaintiff "every opportunity to cure a formal

defect" in its pleading. *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Com'n*, 377 F.3d 682, 687 (7th Cir. 2004), *quoting* 5A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed.1990).

PEGL's complaint does not suffer from a pleading defect. Instead, PEGL has pleaded so many facts that the complaint shows, on its face, that the statute of limitations expired before the complaint was filed. Repleading cannot cure this defect, and it is not an abuse of discretion to deny PEGL leave to file an amended complaint. *Barry Aviation*, 377 F.3d at 682, 688 ("statute of limitations issue may be resolved definitively on the face of the complaint when the plaintiff pleads too much and admits definitively that the applicable limitations period has expired"); *Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994) ("district court does not abuse its discretion in denying leave to amend if the proposed repleading would be futile, and futile repleadings include restating the same facts using different language") (internal citation omitted).

## V. Conclusion

For the foregoing reasons, PEGL's motion requesting oral argument (DE # 38) is **DENIED**; and SDI's motion to dismiss (DE # 31) is **GRANTED**. The clerk shall **ENTER FINAL JUDGMENT** stating that PEGL is entitled to no relief by way of its complaint, and this action is **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

DATE: February 23, 2009

 s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT